**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 9, 2009
Decided June 15, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 08-2674

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District Court |
| *Plaintiff-Appellee,* | for the Central District of Illinois. |
| *v.* | No. 07-30070-001 |
| ROBERT BLUNTSON, | Jeanne E. Scott, |
| *Defendant-Appellant.* | *Judge.* |

**O R D E R**

After his arrest for possession of crack with intent to distribute, Robert Bluntson told the government that he wanted to cooperate in exchange for the possibility of a lower sentence. He signed an agreement and met once with investigators, but the government soon learned that he was working on an escape plan and trying to arrange the murder of his codefendant. The government broke off contact and, not surprisingly, did not file a substantial-assistance motion. At sentencing Bluntson argued that the government had acted in bad faith by not moving for a reduced sentence; the district court rejected that contention and sentenced Bluntson to 20 years' imprisonment—the mandatory minimum given the amount of crack and a prior drug conviction used for enhancement. We affirm

the judgment.

In May 2007 Bluntson and codefendant Antoine Jackson were arrested after authorities caught them with 152 grams of crack in their car. In his initial post-arrest interview on May 17, 2007, Bluntson denied any knowledge of the crack, but in a second interview later that day, he admitted to possessing crack with intent to distribute and gave a detailed account of the offense. On June 6, 2007, Bluntson and Jackson were each indicted on one count of possessing 50 grams or more of crack cocaine. The next day, June 7, 2007, Bluntson signed a "cooperation agreement" with the government, in which the government reserved for itself the sole discretion to decide whether, and to what extent, to recommend a reduced sentenced if Bluntson provided substantial assistance. Immediately after executing the agreement, Bluntson debriefed authorities on illegal drug activity in Chicago. But as far as the record shows, government agents did not talk to Bluntson again after that date.

Almost eight months later, on February 1, 2008, the government filed an enhancement information, *see* 21 U.S.C. § 851, giving Bluntson notice that it would seek a mandatory life sentence on the basis of his two prior felony drug convictions. The parties then engaged in plea negotiations, and on February 28, 2008, the government amended the enhancement information to remove reference to one of those convictions in exchange for Bluntson's guilty plea. Bluntson understood that the deletion of one of the convictions meant that he faced a mandatory minimum sentence of 20 years instead of life, *see* 21 U.S.C. § 841(b)(1). In the months following Bluntson's guilty plea, his defense counsel wrote two letters to the government offering further cooperation. In one letter defense counsel stated, "I have explained to Mr. Bluntson that you have offered no assurances of filing a 5K1.1 letter and he understands, but still wishes to cooperate in hopes of receiving such a departure." There is no evidence that anyone from the government responded to those letters.

Sentencing was set for June 2008. The government did not file a substantial-assistance motion, which prompted Bluntson to file a sentencing memorandum arguing that his cooperation should get him a sentence below the mandatory minimum. *See* 18 U.S.C. § 3553(e); U.S.S.G. § 5K1.1. Bluntson insisted that he had given an "honest and detailed account" of the events leading up to his arrest, had named various Chicago gang members involved in illegal drug activity, and had "made numerous attempts to more actively assist the authorities." He also asserted that his assistance to the authorities placed his family and friends at risk. Defense counsel conceded, however, that Bluntson's efforts to contact the government after the debriefing on June 7, 2007, had been ignored.

In response, the prosecutor stated that agents had not been "eager to re-interview

the defendant again" given that he had lied to them "on more than one occasion, combined with the other circumstances of the case (the defendant's attempts to obstruct justice, his criminal history, etc.)." The prosecutor's only example of Bluntson lying to authorities, however, was the false story he gave to arresting officers on May 17 shortly after his arrest and hours before he decided to come clean about the events leading up to his arrest. That lie, of course, was known to the government before it *invited* Bluntson's cooperation by signing an agreement with him on June 7, 2007, and presumably the government also knew about his criminal history by that date. Thus the post-arrest false statement and Bluntson's criminal history would appear to be pretextual bases for refusing to file a substantial-assistance motion. On the other hand, the prosecutor cited two examples of Bluntson's attempts to obstruct justice. First, on June 6, 2007—the day before Bluntson signed the cooperation agreement—an inmate at the jail where Bluntson was detained had told a guard that Bluntson had offered him $23,000 to kill codefendant Jackson if Jackson would not take responsibility for all of the crack recovered. This information from the inmate, Tony Harold, apparently had not reached federal authorities before Bluntson signed the cooperation agreement and was debriefed by federal agents. Then, on June 14, 2007, Maurice Allen, another inmate at the jail, told authorities that Bluntson had threatened to "have someone do something" to Jackson.

The probation officer who prepared the presentence investigation report calculated a total offense level of 29 and a criminal history category of V, which would have yielded a guidelines imprisonment range of 140 to 175 months if not for the 20-year mandatory minimum. At sentencing Bluntson's only objection was that the government had acted in bad faith by refusing to move for a sentence below the mandatory minimum. The district court gave the defense an opportunity to present evidence, but defense counsel stated that he would stand on his sentencing memorandum. The government, in contrast, called Maurice Allen. Allen explained that he had overheard Bluntson threaten that "somebody would do something" to Jackson. He also testified that Bluntson had planned a jail break and personally offered him $2,500 to obtain a guard's uniform. Defense counsel still put on no evidence, and instead simply accused Allen of lying and accused the government of waiting until after Bluntson had pleaded guilty before "writing off" any possibility that he could assist investigators.

The district court found that the government's primary reasons for refusing to move for a reduced sentence were Bluntson's threat against Jackson's life and his attempt to get a jailer's uniform to escape. The court explained that Bluntson's challenge to Allen's credibility was unimportant because "apparently the Government believed him with respect to those . . . rather serious issues." The court then concluded that the government had not acted in bad faith in refusing to file a substantial-assistance motion. And without that motion, the court continued, a 20-year sentence was mandatory.

On appeal Bluntson argues that the district court erred in refusing to compel the government to file a substantial-assistance motion under § 3553(e) and § 5K1.1. He contends that the government acted in bad faith and that its decision was not rationally related to any legitimate government end. Bluntson insists that the timing of the government's refusal is evidence of bad faith and that the government based its decision not to file a substantial-assistance motion on improper grounds.

Although the government generally has discretion to withhold a substantial-assistance motion, "federal district courts have authority to review a prosecutor's refusal to file a substantial-assistance motion and to grant a remedy if they find that the refusal was based on an unconstitutional motive" or "was not rationally related to any legitimate Government end." *Wade v. United States*, 504 U.S. 181, 185-86 (1992); *see United States v. Miller*, 458 F.3d 603, 605 (7th Cir. 2006). The burden is on the defendant, however, to make a "substantial threshold showing" that the government improperly withheld a substantial-assistance motion before he can receive a remedy. *See Wade*, 504 U.S. at 186; *United States v. Billings*, 546 F.3d 472, 475 (7th Cir. 2008).

Bluntson did not make a substantial showing that the prosecutor acted in bad faith. Indeed, the sequence of events suggests that the government cut off contact with Bluntson as soon as it learned that he was not acting consistently with his commitment to cooperate. The fairest reading of the record—a reading that Bluntson did not try to dispel at sentencing and does not contradict now—is that he signed an agreement to cooperate at the same time he was soliciting help in escaping from jail and in coercing Jackson to either take the wrap for both of them or be killed. It is unclear, based on the record, when exactly the government learned that inmate Harold had come forward on June 6, 2007 to report Bluntson's promise of $23,000 to kill Jackson. But Bluntson has never argued that the government somehow learned of this information before entering into the cooperation agreement the following day. And since inmate Allen did not approach authorities until June 14, 2007, the government certainly did not learn that Bluntson had again threatened Jackson's life and was working on an escape plan until at least a week after the June 7 debriefing. There is nothing in the record to suggest that the government had any further contact with Bluntson after learning about his continuing criminal conduct, and thus there is no support for Bluntson's suggestion that the government deceived him by continuing to solicit his help all the while knowing that it would not move for a reduced sentence.

It is also unclear, based on the record, when exactly Bluntson's threats and escape attempt occurred. If he committed these acts before executing the cooperation agreement, then, by not disclosing his actions during the debriefing, he violated his written promise to "provide <u>complete</u> and <u>truthful</u> information" regarding his criminal conduct and not to

"conceal or minimize [his] actions or involvement in any offense." On the other hand, if Bluntson threatened Jackson's life and attempted to escape from jail after executing the cooperation agreement, then he violated his promise "not to engage in any criminal activity of any kind," which voided the cooperation agreement and released the government from any obligation to reward whatever assistance he might already have provided.

There is the wrinkle that the prosecutor carelessly responded to Bluntson's sentencing memorandum by citing facts that should not reasonably have led to withholding a substantial-assistance motion, since those same facts did not dissuade the government from agreeing to accept Bluntson's cooperation in the first place. As noted previously, Bluntson's post-arrest false statement was unquestionably known to the government when the prosecutor signed the cooperation agreement, and it would be hard to imagine that the prosecutor did not know the extent of Bluntson's criminal history a month after his arrest. But at sentencing the district court was careful to base its finding of good faith on Bluntson's threats to Jackson and his attempt to escape from jail. That conduct surely gave the government a legitimate basis for withholding a substantial-assistance motion. *See United States v. Perez*, 526 F.3d 1135, 1139 (8th Cir. 2008); *United States v. Butler*, 272 F.3d 683, 687 (4th Cir. 2001); *United States v. Hartwell*, 302 F. Supp. 2d 609, 620 (E.D. Va. 2004).

Accordingly, we **AFFIRM** the judgment of the district court.